IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* Cody Wheeler | § § § § | CIVIL NO. _____ |
| Plaintiffs, | § § § | **RELATOR CODY WHEELER'S ORIGINAL COMPLAINT AND JURY DEMAND** |
| v. | § § | *ORIGINAL COMPLAINT FILED IN CAMERA AND UNDER SEAL,* |
| JAMES W. TURNER CONSTRUCTION, LTD., J.W. TURNER CONSTRUCTION, INC., JWTC HOMES, LTD., JAMES W. TURNER CONSTRUCTION, INC., JWT INTERESTS, LTD., JWTC-LA, LLC., CASTLEROCK RESOURCES, LLC, JAMES W. TURNER, and LAUREN TURNER | § § § § § § § § | *PURSUANT TO 31 U.S.C. § 3730(b)(2)* **\*\*DO NOT PLACE IN PRESS BOX\*\*** **\*\*DO NOT ENTER ON PACER\*\*** |
| Defendants. | § | |

## RELATOR CODY WHEELER'S ORIGINAL COMPLAINT

1.  On behalf of the United States of America, Plaintiff/Relator Cody Wheeler ("Relator") brings this action against Defendants James W. Turner Construction, Ltd. ("JWTC. Ltd."), J.W. Turner Construction, Inc. ("JWTC, Inc."), JWTC Homes, Ltd., James W. Turner Construction, Inc., JWT Interests, Ltd., JWTC-LA, LLC, and James W. Turner ("J.W. Turner") (collectively the "James Turner Defendants"), and against Castlerock Resources, LLC ("Castlerock"), and Lauren Turner (all, collectively "Defendants") pursuant to the False Claims Act, 31 U.S.C. §3729-3733.

2.  Relator seeks to recover all damages, penalties, and other remedies established by the False Claims Act on behalf of the United States and on his own behalf. Relator shows the Court as follows:

1

# I.    INTRODUCTION

3.    Defendants developed and implemented a classic mom-and-pop scheme to defraud the federal government by manipulating the Texas Historically Underutilized Business Program (the "HUB Program") and thereby fraudulently acquiring Hurricane Harvey construction contracts for which they had not qualified, which were funded by federal Community Development Block Grant-Disaster Relief ("CDBG-DR") and Community Development Block Grant-Mitigation Program ("CDBG-MIT") funds.  CDBG-DR and CDBG-MIT funds come from the United States Department of Housing and Urban Development ("HUD") and are allocated to, among other recipients, the Texas General Land Office ("GLO"). The GLO serves as the administrator of these contracts in Texas, using federal monies to make payments on CDBG-DR and CDBG-MIT contracts.  The James Turner Defendants promised the government that they would comply with the HUB Program's subcontracting requirements in order to assert eligibility for the contracts at issue; later they represented that they had in fact complied with that program in order to receive payment under those contracts.

4.    In fact, the James Turner Defendants never complied with HUB Program requirements, because they relied on a sham, purpose-built payroll-services business in James Turner's wife's name, for 90% or more of their promised HUB subcontract participation.

5.    The HUB Program is designed to support small businesses that have suffered economically from disadvantages resulting from the owners' membership in certain groups – primarily women, minorities, and service-disabled veterans.  Defendants registered Castlerock Resources, LLC,  in Lauren Turner's name as a HUB in 2018.  While Lauren Turner, as a woman, belongs to a qualifying historically disadvantaged group, Defendants falsely certified that the company was a small business.  It is not, because it is hopelessly "affiliated" with James

Turner's companies, one or all of which operates far beyond the maximum revenue for a small business under HUB regulations.

6.    Affiliation of Castlerock with the James Turner Defendants is established under the affiliation rules of the federal government's Small Business Administration ("SBA"), which rules are applicable under the Texas HUB Program to businesses applying for certification as HUBs.  Texas Admin. Code §§20.282(29) and 20.294(a).  The federal SBA rules contain several provisions, each of which determine unambiguously that Castlerock and the James Turner Defendants are presumed to be affiliated:

- Castlerock has an identity of interest with the James Turner Defendants by way of Lauren Turner's marriage to J.W. Turner, 13 C.F.R. §121.103(f)(1);

- Castlerock has an identity of interest with the James Turner Defendants because Castlerock is economically dependent on the James Turner Defendants, 13 C.F.R. §121.103(f)(2);

- Castlerock is a newly organized concern which the Defendants organized and then provided with virtually all of its business, 13 C.F.R. §121.103)(g); and

- The James Turner Defendants have the power to control and in fact do control Castlerock, 13 C.F.R. §121.103(a).

7.    The Texas HUB regulations disqualify Castlerock as a HUB because of the affiliation between Castlerock and the James Turner Defendants, which requires the assets of all the corporate defendants to be added together for size purposes:

- Lauren Turner does not qualify as a HUB owner because the affiliation between Castlerock and the James Turner Defendants causes her to be unable to establish

3

sufficient "active participation" in Castlerock's business to be a HUB owner. Texas Gov't Code §2161.001(2); Texas Admin. Code §20.283(a)(10); and

- Because of its affiliation with the James Turner Defendants, Castlerock is too big to be a HUB under the HUB Program's graduation provisions. Texas Admin. Code §§20.282(29) and 20.294(a). Therefore, neither Lauren Turner nor her alleged HUB business, Castlerock, can meet the HUB Program's requirement of economic disadvantage (which is keyed to size), and Castlerock cannot be a legitimate HUB. Texas Gov't Code §2161.001(2) and (3); Texas Admin. Code §20.282(8).

8. The HUB Program drives support to legitimate HUBs by requiring prime awardees of government contracts to give subcontracts to a certain quota of HUBs, thus ensuring that HUBs receive a fair piece of the pie on large government contracts. During the relevant period, the requirement was 21.1%.

9. By diverting most of that 21.1% to an affiliated company, Defendants were able to funnel to themselves nearly the full value of contracts that the law required them to offer to businesses that were truly historically disadvantaged, enriching themselves while winning awards for their involvement in the program.

10. JWTC, Ltd. has won and been paid under at least five Hurricane Harvey construction contracts while certifying to HUB Program compliance based on Castlerock's participation. In bids for this work (to be performed in Victoria, Texas, among other locations), in subcontracting plans submitted with those bids, and through monthly reports to the GLO on its use of HUBs under these contracts, JWTC, Ltd. proposed that it planned to and that it actually

did satisfy its HUB goals through the use of Castlerock as a significant subcontractor on the projects.

11.     In sum, the Defendants have won five contracts worth a total of more than $191 million[1] that they would never have been awarded or paid under had they not lied in registering Castlerock as a HUB and misrepresented compliance with the HUB Program in bids and monthly reports.

## II.      JURISDICTION AND VENUE

12.     This action arises under the federal False Claims Act, 31 U.S.C. §3729, *et seq.* ("FCA").

13.     Jurisdiction over this action is conferred upon this Court by 31 U.S.C. §3732(a) and 28 U.S.C. §1331, because this action arises under the laws of the United States.

14.     Venue is proper in this district pursuant to 31 U.S.C. §3732(a), which provides that "any action under §3730 may be brought in any judicial district in which the Defendant or, in the case of multiple Defendants, any one Defendant can be found, resides, transacts business, or in which any act proscribed by §3729 occurred."  All of the Defendants engage in business in the Southern District of Texas, and virtually all of the actions giving rise to this action occurred in this District.

15.     There are no bars to recovery under 31 U.S.C. §3730(e).  Specifically, substantially the same allegations as those alleged in this suit have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party, or in a congressional, Government Accountability Office, or other Federal report, hearing,

---

[1] This total includes four of the five contracts at issue; Relator does not have the work orders for GLO Contract No. 19-070-006.  Presumably, that contract would drive the total amount at issue in this case to over $200 million.

audit, or investigation, or from the news media.  In the alternative, Relator is an original source as defined in 31 U.S.C. §3730(e)(4)(B).  Relator has knowledge that is independent of and materially adds to any publicly disclosed allegations or transactions and has voluntarily provided this information to the United States prior to filing this complaint by serving a voluntary pre-filing disclosure statement.

16.     All Defendants operate as a single business entity.  Defendants J.W. Turner and Lauren Turner (the "Individual Defendants") structured, organized, and operated Defendants James W. Turner Construction, Ltd., J.W. Construction, Inc., JWTC Homes, Ltd., James W. Turner Construction, Inc., JWT Interests, Ltd., JWTC-LA, LLC, and Castlerock Resources, LLC (the "Business Entity Defendants") such that the business entities do not and have never maintained separate identities.  For example, the Business Entity Defendants have centralized control, shared finances, and mutual purposes, including in the common and centralized offices and employees of the Business Entity Defendants, the common control exercised by J.W. Turner, and the rendering of services by the employees of all of the companies on behalf of James W. Turner Construction, Ltd., and the Individual Defendants.  Further, the Individual Defendants have used the Business Entity Defendants for the purpose of perpetrating (and did perpetrate) an actual fraud for their personal benefit.

### III.    PARTIES

#### A.    Relator Cody Wheeler

17.     Relator Cody Wheeler lives in Pasadena, Texas.  Relator was hired as a construction superintendent by JWTC, Inc. in approximately September of 2018.  At the outset, Relator was hired as an independent contractor, and he transitioned to employee status in approximately January 2019.  Relator served as a superintendent for JWTC, Inc., managing the building of homes by dealing with subcontractors, scheduling, releasing payments to

subcontractors when appropriate, ordering materials, etc.  Several months after beginning his job at JWTC, Inc., Relator was asked to and did sign documents purporting to transfer his employment relationship to Castlerock; Relator went from independent contractor to employee in the context of this transfer.  (Exhibit 1)  However, nothing about Relator's job changed as a result of this transition.  Relator worked for JWTC., Inc./Castlerock until mid-November 2019 when he resigned.  In addition to working as a construction superintendent for JWTC, Inc./Castlerock, Relator is a veteran, having served in the Marine Corps from 2003 to 2007.  He was elected to the Pasadena Texas City Council in May 2013 and served as a member of that council until June 2021.

### B.    Defendants

18.    Defendant James W. Turner Construction, Ltd. ("JWTC, Ltd.") is a limited partnership organized under the laws of the State of Texas with its principal place of business located in Tomball, Texas.  JWTC, Ltd. is the entity that entered into all of the contracts at issue in this case, and J.W. Turner (the individual) controls this business as its President, Chief Executive Officer, and General Partner.  Lauren Turner serves as Chief Financial Officer, Chief Operating Officer, Office Manager, and a Limited Partner of JWTC, Ltd.[2]  JWTC, Inc. serves as a General Partner of JWTC, Ltd. along with J.W. Turner the individual.

19.    Defendant J.W. Turner Construction, Inc. ("JWTC, Inc.") is a corporation organized under the laws of the State of Texas in January 1997 with its principal place of business located in Tomball, Texas.  While JWTC, Inc. did not sign nor is it named in any of the contracts at issue, it is affiliated with JWTC, Ltd., and its employees are in large part identical to

---

[2] Lauren Turner has represented that she removed herself as a Limited Partner of JWTC, Ltd. in December 2018; however, Relator has seen no documentation of such a removal.

those at JWTC, Ltd.  JWTC, Inc. serves as a General Partner in JWTC, Ltd.  Furthermore, JWTC, Inc. is controlled by J.W. Turner, who serves as its President, Chief Executive Officer, Secretary, and Registered Agent.  Lauren Turner holds the titles of Vice President and Chief Financial Officer of JWTC, Inc.

20.    Defendant JWTC Homes, Ltd. is a limited partnership organized under the laws of the State of Texas on February 17, 2004, with its principal place of business located in Tomball, Texas.  JWTC, Inc. serves as General Partner and registered agent for JWTC Homes, Ltd.

21.    Defendant James W. Turner Construction, Inc. is a corporation believed to have been organized under the laws of the State of Texas.

22.    Defendant JWT Interests, Ltd. is a limited partnership organized under the laws of the State of Texas on February 1, 2001, with its principal place of business located in Tomball, Texas.  JWTC, Inc. serves as General Partner and registered agent for JWT Interests, Ltd.

23.    Defendant JWTC-LA, LLC is a limited liability company believed to have been organized under the laws of the State of Louisiana on September 28, 2015, under the full name "JWTC-Louisiana, LLC."

24.    Defendant Castlerock Resources, LLC ("Castlerock") is a limited liability company organized under the laws of the State of Texas with its principal place of business located at 27 Philbrook Way in Spring, Texas.  Castlerock was formed on April 13, 2018 by Organizer Marjuana B. Williams with Lauren Turner serving as Registered Agent and Owner/Manager of the company.  Castlerock holds itself out as a disaster recovery residential construction company, but in fact it engages only in payroll servicing for JWTC, Inc. and JWTC, Ltd.; it has an ongoing contract under which it "leases" its payrolled employees to JWTC, Inc.

8

Lauren Turner is Castlerock's only true employee, initially performing the company's payroll functions herself and now overseeing the outsourcing of those functions. Castlerock operates primarily out of the Turners' home at 27 Philbrook Way in Spring, Texas. Castlerock also has rented office space from Regus Office, a major, global office real estate and coworking company which provides working space to individuals and businesses that do not have their own space or need temporary space for some other reason. Castlerock alleges that it has "a couple of other customers" in addition to the JWTC, Inc. and JWTC, Ltd., but to the extent that those other customers exist, they represent only a minuscule portion of Castlerock's business.

25.     Defendant James W. Turner ("J.W. Turner") resides at 27 Philbrook Way in Spring, Texas with his spouse, Defendant Lauren Turner, to whom he has been married since 1994. J.W. Turner is President, Chief Executive Officer, Secretary and Registered Agent of Defendant J.W. Turner Construction, Inc., and he is President, Chief Executive Officer and General Partner of Defendant James W. Turner Construction, Ltd. J.W. Turner controls all of the Business Entity Defendants.

26.     Defendant Lauren Turner resides at 27 Philbrook Way in Spring, Texas. She has been married to J.W. Turner since 1994, who also lives at this address. Lauren Turner serves as Chief Financial Officer and Vice President of Defendant JWTC, Inc. She serves as Chief Financial Officer, Chief Operating Officer, Office Manager, and Limited Partner of Defendant James W. Turner Construction, Ltd. She is Owner/Manager and Registered Agent of Defendant Castlerock Resources, LLC. Despite these titles, Lauren Turner has primarily performed administrative duties such as invoicing and payroll services for some of the Business Entity Defendants, and she has no actual construction experience or expertise.

27.     As required by 31 U.S.C. §3730(b), Relator will serve upon the Attorney General of the United States and the United States Attorney for the Southern District of Texas an original disclosure statement as well as all material evidence and information, contemporaneously with the service of his Original Complaint.

## IV.    FACTUAL BACKGROUND

28.     Hurricane Harvey was a Category 4 hurricane that hit the coasts of Texas and Louisiana in August 2017, causing catastrophic damage and over 100 deaths.  It inflicted more than $125 billion in damage, primarily from catastrophic rainfall-triggered flooding in the Houston area and Southeast Texas.

29.     On August 25, 2017, President Donald Trump declared Hurricane Harvey a major disaster for the State of Texas.  https://www.fema.gov/disaster/4332#  Congress appropriated money in the form of Community Development Block Grant – Disaster Recovery ("CDBG-DR") funds to the United States Department of Housing and Urban Development ("HUD") to address recovery from Hurricane Harvey.  HUD, in turn, allocated some of these CDBG-DR funds to Texas for its Hurricane Harvey recovery efforts.  82 Fed. Reg. 61320 (December 27, 2017). Governor Greg Abbott appointed the Texas General Land Office ("GLO") to lead these recovery efforts, and the GLO's State Action Plan for $5.024 billion for Hurricane Harvey recovery was approved by HUD on June 25, 2018.[3]

30.     Congress also appropriated money in the form of Community Development Block Grant-Mitigation Program ("CDBG-MIT")[4] funds to HUD in February 2018.  This appropriation

---

[3] https://glo.texas.gov/the-glo/news/press-releases/2018/june/cmr-george-p-bush-announces-hud-approval-of-5-billion-state-action-plan-for-hurricane-harvey-housing-recovery.html#:~:text=The%20Texas%20General%20Land%20Office%20Cmr%20George%20P.,funds%20to%20help%20Texas%20recover%20from%20Hurricane%20Harvey.

[4] The  CDBG-MIT program is distinct from the CDBG-DR program in that it is designed to "[i]ncrease resilience to disasters and reduce or eliminate the long-term risk of loss of life, injury, damage to and loss of property, and

was originally for $12 billion for qualifying disasters in 2015, 2016, and 2017, and HUD allocated an additional $3.9 billion, bringing the amount available for mitigation to nearly $16 billion.  HUD allocated $4,074,456,000of these CDBG-MIT funds to the GLO to address mitigation necessitated by Hurricane Harvey in Texas.

      31.    The GLO has awarded numerous contracts for the undertaking of Hurricane Harvey recovery and mitigation work using CDBG-DR and CDBG-MIT funds.  The following such contracts were awarded to JWTC, Ltd.:

      a.    **GLO Contract No. 18-179-001-A881**, October 30, 2017, $16,800,000, a Notice to Proceed-Driven Contract for Residential Construction Repair Services for Disaster Recovery, funded with CDBG-DR funds.  (Exhibit 2) The Notice to Proceed on this contract, dated originally December 19, 2017, is attached as Exhibit 3 and, as amended, extends the total amount of the contract to **$30,000,000**.

      b.    **GLO Contract No. 19-094-007**, October 16, 2018, a Major Construction Contract that is work order driven and funded with CDBG-DR funds. (Exhibit 4)

    (1)    Work Order B531, December 6, 2018, $43,627,036.71.  (Exhibit 5)

    (2)    Work Order B532, December 9, 2018, $33,687,682.16 as amended. (Exhibit 6)

    (3)    Work Order B533, December 8, 2018, $17,190,430.82 as amended. (Exhibit 7)

---

suffering and hardship by lessening the impact of future disasters." https://www.hudexchange.info/programs/cdbg-mit/

(4)    Work Order C418, April 23, 2020. $20,000,000.00.  (Exhibit 8)

(5)    Work Order C568, January 8, 2021, $ 13,333,333.33.  (Exhibit 9)

(6)    The total value under this contract is **$127,838.483.02**

c.  **GLO Contract No. 19-070-006**, August 29, 2019, a work order driven contract for Residential Construction Repair Services funded with CDBG-DR funds.  (Exhibit 10)

d.  **GLO Contract No. 21-088-001-C748**, January 30, 2021, $16,675,000, a Major Construction Contract for reconstruction services on single-family residential structures, funded with CDBG-MIT funds.  (Exhibit 11)

e.  **GLO Contract No. 21-076-001-C743**, February 8, 2021, $16,625,000, a Major Construction Contract for reconstruction services on single-family residential structures, funded with CDBG-MIT funds.  (Exhibit 12)

A copy of each of these contracts and, where appropriate, the work orders thereunder are attached hereto as Exhibits 2 through 12, as indicated.  Total potential earnings under these contracts are over $191,000.000 ($191,138,483 without any amount attributed to work under GLO Contract No. 19-070-006, for which Relator does not have the specific work orders implemented).

## V.    STATUTORY AND REGULATORY FRAMEWORK

### A.    HUD's Community Development Block Grant Program and Its Incorporation of SBA Size Regulations

32.    Federal funding for the contracts at issue in this case flows from HUD's Community Development Block Grant Program, which is established and governed by Chapter 69 of Title 42 of the U.S. Code.  42 U.S.C. §5301-5321.  The primary purpose of this program is "the development of viable urban communities, by providing decent housing and a suitable

12

living environment and expanding economic opportunities, principally for persons of low and moderate income." 42 U.S.C. §5301(c).

1.     **CDBG Program's Incorporation of Federal SBA Size Standards and Regulations**

33.     HUD looks to the Small Business Administration's ("SBA") goals and regulations in pursuing its own policy goals for the CDBG program.  Specifically, the CDBG Program defines "small business" as "a business that meets the criteria set forth in section 632(a) of title 15."  42 U.S.C. §5302(a)(23).  That incorporation by reference also encompasses the Small Business Administration's (SBA) size regulations at 13 C.F.R. §121.

34.     The SBA defines a "Small Business Concern" generally as "one which is independently owned and operated and which is not dominant in its field of operation."  15 U.S.C. §632(a)(1).

35.     The SBA has further established size standards for specific types of economic activities and industries using the North American Industry Classification System ("NAICS").  Each of the codes in the NAICS has its own particular size standard, and the SBA publishes a table of these standards for reference.  *See* 13. C.F.R. §121.201; https://www.sba.gov/document/support--table-size-standards,  A size standard represents "the maximum allowed for a concern and its affiliates to be considered small."  13 C.F.R. §121.201. In other words, a size standard is "the largest a concern can be and still qualify as a small business for Federal Government programs."  SBA, Table of Small Business Size Standards, https://www.sba.gov/document/support--table-size-standards.

### 2.    SBA Affiliation Rules for Determining Size[5]

36.    Also incorporated by HUD into the CDBG program are the SBA's rules for determining whether a business is affiliated to another business, impacting determination of its size.[6]  In determining whether an entity qualifies as a small business concern, the SBA counts the receipts of all of the entity's domestic and foreign affiliates, regardless of whether those affiliates are organized for profit.  *See* 13 C.F.R. §121.103(a)(6).  In other words, the annual receipts of all affiliated businesses are added together to determine whether an entity qualifies as a small business.

37.    There are several circumstances that the SBA explicitly establishes will lead to a presumption of affiliation between business entities.  Of particular relevance here are the rules related to "Affiliation based on identity of interest," 13 C.F.R. §121.103(f), and "Affiliation based on the newly organized concern rule," 13 C.F.R. §121.103(g).

### a.    Affiliation Based on Identity of Interest – Including Spouses

38.    Regarding affiliation based on identity of interest, the SBA regulations provide:

> **(f) *Affiliation based on identity of interest.*  Affiliation may arise among two or more persons with an identity of interest. Individuals or firms that have identical or substantially identical business or economic interests (such as family members, individuals or firms with common investments, or firms that are economically dependent through contractual or other relationships) may be treated as one party with such interests aggregated. Where SBA determines that such interests should be aggregated, an individual or firm may rebut that determination with evidence showing that the interests deemed to be one are in fact separate.
>
> > **(1)** Firms owned or controlled by **married couples … are presumed to be affiliated with each other** if they conduct business with each other, such as subcontracts or joint ventures or

---

[5] As detailed below in ¶¶ 65-69, the Texas HUB Program uses the SBA size standards and regulations in determining whether entities are "economically disadvantaged" and therefore eligible for certification as HUBs.

[6] Note that, as described below, the Texas HUB program also looks to SBA affiliation rules in determining a business's size.

> share or provide loans, resources, equipment, locations or
> employees with one another. This presumption may be overcome
> by showing a clear line of fracture between the concerns.
>
> **(2)** SBA may presume an identity of interest based upon economic
> dependence if the concern in question derived 70% or more of its
> receipts from another concern over the previous three fiscal years.

13 C.F.R. §121.103 (f) (emphasis added).

39.    In explanation of this affiliation rule, the SBA states in its Small Business

Compliance Guide – Size and Affiliation" that "Individuals or firms that have identical (or

substantially identical) business or economic interests may be treated as one party unless they

can demonstrate otherwise. Family members, persons with common investments, or firms that

are economically dependent to each other through contractual (or other) relationships, are among

those treated this way…. Patterns of subcontracting, commingling of staff and/or facilities, and

other veiled attempts to disguise the true nature of the relationship may evidence an identity of

interest." SBA Small Business Compliance Guide – Size and Affiliation, p. 7 (June 2018).

### b.  Affiliation Based on Newly Organized Concern Rule

40.    Regarding affiliation based on the newly organized concern rule, 13 C.F.R.

§121.103)(g) provides:

> **(g)** ***Affiliation based on the newly organized concern rule.*** Except as
> provided in § 124.109(c)(4)(iii), affiliation may arise where former or
> current officers, directors, principal stockholders, managing members, or
> key employees of one concern organize a new concern in the same or
> related industry or field of operation, and serve as the new concern's
> officers, directors, principal stockholders, managing members, or key
> employees, and the one concern is furnishing or will furnish the new
> concern with contracts, financial or technical assistance, indemnification
> on bid or performance bonds, and/or other facilities, whether for a fee or
> otherwise. A concern may rebut such an affiliation determination by
> demonstrating a clear line of fracture between the two concerns. A "key
> employee" is an employee who, because of his/her position in the concern,
> has a critical influence in or substantive control over the operations or
> management of the concern.

13 C.F.R. §121.103(g).

41.    The SBA Small Business Compliance Guide – Size and Affiliation elaborates on this rule of affiliation as follows:

> A new concern is affiliated with an existing concern if:
>
> > 1) The former (or current) officers, directors, principal stockholders, managing members, or key employees of one concern organize a new concern;
> >
> > (2) Both concerns are in the same or related industries or fields of operation;
> >
> > (3) The individuals that organized the new concern serve as the new concern's officers, directors, principal stockholders, managing members, or key employees; and
> >
> > (4) The one concern is furnishing or will furnish the new concern with contracts, financial or technical assistance, indemnification or bid or performance bonds, and/or other facilities, whether for a fee or otherwise.
>
> The affiliation may be rebutted by showing that there is a clear fracture between the two businesses.

SBA Small Business Compliance Guide – Size and Affiliation, p. 8 (June 2018).

42.    The Small Business Compliance Guide – Size and Affiliation also clarifies concerning the effect of subsections (f) and (g) together that:

> A concern that is economically dependent upon another person or concern may be found to be affiliated with that concern. It may also be found affiliated with other concerns controlled by the individual or concern to which it is dependent. It may be found affiliated on the basis of control or power to control, an identity of interest, the newly organized concern rule, or a combination of these.
>
> Affiliation through economic dependence can be presumed where the concern in question derived 70% or more of its receipts from another concern over the previous three fiscal years….
>
> *Example 1*: Company A performs subcontracts for Company B, and Company B accounts for 90% of Company A's revenues. Company A's existence depends on work from Company B and the two are deemed affiliates.

16

SBA Small Business Compliance Guide – Size and Affiliation, p. 9 (June 2018).

### 3.    SBA Consequences for Misrepresenting Size

43.    Every business seeking to do business with the Federal government must register annually under the government's System for Award Management ("SAM"), and must disclose information that includes whether the business qualifies as a small business.  *See* FAR 52.204-7, FAR 52.204-13 and FAR 2015-0005.

44.    Furthermore, it is a federal criminal offense to "misrepresent[ ] the status of any concern or person as a 'small business concern' … in order to obtain for oneself or another any" prime contract or subcontract. 15 U.S.C. §645.

45.    In fact, pursuant to 15 U.S.C. §632(w)(1), there is a "presumption of loss to the United States based on the total amount expended on the contract … whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation."  15 U.S.C. §632(w)(1).

46.    Further, 15 U.S.C. §632(w)(2) states that:

The following actions shall be deemed affirmative, willful, and intentional certifications of small business size and status:

(A) Submission of a bid or proposal for a Federal grant, contract, [or] subcontract … reserved, set aside, or otherwise classified as intended for award to small business concerns.

(B) Submission of a bid or proposal for a Federal grant, contract, [or] subcontract … which in any way encourages a Federal agency to classify the bid or proposal, if awarded, as an award to a small business concern.

(C) Registration on any Federal electronic database for the purpose of being considered for award of a Federal grant, contract, [or] subcontract … as a small business concern.

15 U.S.C. §632(w)(2). These provisions, as well as the Department of Justice's many criminal and civil enforcement actions, demonstrate that misrepresentations about size are material to the United States.

> **4. State Administration of CDBG Grant Funds, Including Procurement Standards and their Requirements to Forward Work to Small, Minority, and Women-Owned Businesses**

47. The regulations that govern HUD's Community Development Block Grant Program generally are found at 24 C.F.R. Part 570.

48. State and local government grantees of CDBG funds are responsible for administering and monitoring the usage of CDBG funds. 24 C.F.R. §570.501 provides that "the recipient is responsible for ensuring that CDBG funds are used in accordance with all program requirements" and "is also responsible for determining the adequacy of performance under subrecipient agreements and procurement contracts." 24 C.F.R. §570.501(b).

49. For CDBG funds granted to states, the federal government allows that the State "is responsible for the administration of all CDBG funds," 24 C.F.R. §570.489(a)(1), and that the State shall follow its own procurement policies and procedures "based on full and open competition." 24 C.F.R. §570.489(g).

50. The Texas GLO gives the following guidance regarding CDBG-DR procurement:

> "The Federal Register Notices for CDBG-DR grants require that procurement processes and standards comply with the principles of <u>full and open competition</u> and include an evaluation of the cost or price of the for [sic] goods and services funded with grant funds. State Grantees may:
>
> - adopt 2 CFR 200.318 through 200.327; or
>
> - follow the Grantee's own procurement policies and procedures and establish requirements for procurement policies and procedures for local governments and subrecipients based on full and open competition pursuant to 24 CFR 570.489(g), provided that the procurement requirements include evaluation of the cost or price of the product or service; or

- adopt 2 CFR 200.317, meaning that the Grantee follows the Grantee's own procurement policies and procedures and evaluate the cost or price of the product or service, but impose 2 CFR 200.318 through 200.327 on its subgrantees and subrecipients."

https://recovery.texas.gov/local-government/resources/procurement-contracting/index.html.

51.    Thus, Texas opts to require subrecipients of CDBG funds to comply with 2 C.F.R. §200.318-§200.327.  Those regulations include requirements for small and minority businesses and women's business enterprises: "The non-Federal entity must take all necessary affirmative steps to assure that minority businesses, women's business enterprises, and labor surplus area firms are used when possible."  2 C.F.R. §200.321(a) (emphasis added).  Subsection (b) of §200.321 lists six affirmative steps that must be included in the non-Federal entities' efforts under this regulation, including "(2) [a]ssuring that small and minority businesses, and women's business enterprises are solicited whenever they are potential sources."  2 C.F.R. §200.321(b).

**B.    Texas's Historically Underutilized Businesses Program**

52.    The Texas GLO distributes funds subject also to Texas's Historically Underutilized Businesses Program (the "HUB Program"), which is governed by the Texas Government Code, Chapter 2161, and the Texas Administrative Code, Title 34, Part 1 Chapter 20.  The purpose of the HUB Program is "to promote full and equal business opportunities for all businesses in an effort to remedy disparity in state procurement and contracting in accordance with the HUB goals specified in the State of Texas Disparity Study."  Tex. Admin. Code §20.281.

53.    HUB subcontracting requirements apply whenever a state agency enters into a contract worth $100,000 or more. Texas Gov't Code §2161.251(a).[7]

---

[7] See Section V.B.3 below for details of HUB subcontracting requirements.

54.     The HUB Program is administered by the Texas Comptroller of Public Accounts (the "Comptroller").  The Comptroller is responsible for certifying HUBs according to the Program's rules and regulations.  The process for that certification is set out in Texas Administrative Code §20.288.

### 1.     HUB Registration and Certification

55.     Texas Administrative Code §20.288(a) requires applicants to submit their applications to the Comptroller and to affirm therein, under penalty of perjury, that the business qualifies as a HUB.  The Comptroller may reject an application for a variety of reasons, including that the applicant does not meet the definition of a HUB or because the application contains false information.  Texas Admin. Code §20.288.

56.     In fact, the Texas Government Code makes it a third degree felony for a person to intentionally apply for a purchasing or public works contract as a HUB and know that the "person" is not a HUB.  Texas Gov't Code §2161.251.

57.     Furthermore, if upon review the Comptroller determines that a previously certified HUB business does not meet the definition of a HUB, the Comptroller is required to revoke that business's certification as a HUB.  Texas Admin. Code §20.291.  *See also* Texas Admin. Code §20.292(a).

58.     The HUB Program applies to all Texas state agency construction projects, including those entered in to by the Texas General Land Office.  Texas Gov't Code §2161.004.

### 2.     HUB Eligibility

59.     A HUB is defined as a for profit entity with its principal place of business in Texas which is at least 51 percent owned by one or more persons who are "economically disadvantaged" due to their membership in certain groups, including American women. Specifically, the Texas Government Code defines a HUB in relevant part as:

20

an entity with its principal place of business in [Texas] that is:

> (A) a corporation formed for the purpose of making a profit in which 51 percent or more of all classes of the shares of stock or other equitable securities are owned by one or more economically disadvantaged persons who have a proportionate interest and actively participate in the corporation's control, operation, and management;

Texas Gov't Code §2161.001(2).

### a. Qualifying Owner of a HUB: Active Participant and Economically Disadvantaged

60.    A "qualifying owner" under the HUB Program, therefore, is a natural person who, in addition to meeting ownership requirements, resides in Texas, demonstrates "active participation in the control, operation, and management of the entities' affairs," and is "economically disadvantaged" by means of membership in one of several groups, including women.  Texas Admin. Code §20.282(19).

### i.    Active Participation

61.    The determination of whether an owner is a "qualifying owner" under the HUB Program is guided by Texas Administrative Code §20.283 – Evaluation of Active Participation in the Control, Operation and Management of Entities.  This regulation provides in relevant part as follows:

> (a) In determining the extent of "active participation in the control, operation and management" necessary for qualification as a HUB, the comptroller may consider all relevant evidence.…  Factors which may be considered include, but are  not limited to:
>
> > (10) whether and to what extent the HUB business shares management, board members, partners, employees, or other

> resources with another business in amounts or ways <u>which might</u>
> <u>indicate that they are related or affiliated businesses</u>.

Texas Admin. Code §20.283(a) (emphasis added). Thus, subsection (a)(10) indicates that

"affiliated businesses" should be considered in the context of determining whether the owner of

the business is a "qualifying owner" under the HUB Program.

62. The Comptroller is directed to undertake Certification and Compliance Reviews

in accordance with Texas Administrative Code §20.292. This regulation, subsection (c), states:

> The applicant's business documentation shall be reviewed to substantiate
> the required level of participation and control, and must demonstrate
> responsibility in the critical areas of the business' operation. <u>Eligible</u>
> <u>owners must be able to make independent and unilateral business</u>
> <u>decisions which guide the future and destiny of the business, and must be</u>
> <u>proportionately responsible for the direction and management of the</u>
> <u>business</u>. The eligible owner's level of participation in the business will be
> evaluated as set forth in §20.283 of the title (relating to Evaluation of
> Active Participation in the Control, Operation, and Management of
> Entities). Absentee or titular ownership by eligible owners who do not
> take an active role in controlling and participating in the business is not
> consistent with the definition of a HUB.

Texas Admin. Code §20.292(c) (emphasis added).

## ii. Economically Disadvantaged

63. In order to be classified as "economically disadvantaged", a person must:

(A) … [be ] a member of a certain group, including:

(i) Black Americans;

(ii) Hispanic Americans;

(iii) women;

(iv) Asian Pacific Americans;

(v) Native Americans; and

(vi) veterans as defined by 38 U.S.C. Section 101(2) who have
suffered at least a 20 percent service-connected disability as
defined by 38 U.S.C. Section 101(16); <u>and</u>

22

<u>(B) ha[ve] suffered the effects of discriminatory practices or other similar insidious circumstances over which the person has no control.</u>

Texas Gov't Code §2161.001(3) (emphasis added).

64.     The Texas Administrative Code specifies that an "economically disadvantaged person" is "[a]n eligible HUB owner … whose business has not exceeded the graduation size standards according to the comptroller's graduation procedures in §20.294 of this title (relating to Graduation Procedures)."  Texas Admin. Code §20.282(8).  In other words, if a person who belongs to one of the enumerated groups, and his or her business is small, the person satisfies both elements of "economically disadvantaged."

### b.  HUB Graduation Standards and Procedures

65.     The Graduation Procedures in Texas Administrative Code §20.294 establish the size standards for HUBs.  The Texas Government Code allows that the Comptroller may establish size standards "that a business may not exceed if it is to be considered a historically underutilized business under this chapter.  In determining the HUB size standards, the comptroller shall determine the size at which a business should be considered sufficiently large that the business probably does not significantly suffer from the effects of past discriminatory practices."  Texas Gov't Code §2161.0015.

66.     In Texas Administrative Code §20.282(29), Texas defines its HUB size standards as "Graduation thresholds established by the HUB program consistent with the comptroller's rules which are based on the U.S. Small Business Administration's size standards, and based on the North American Industry Classification System codes. These may also be used to determine eligibility for HUB registration."  Texas Admin. Code §20.282(29) (emphasis added).  Under this language, **Texas explicitly incorporates into its HUB Program by reference the SBA**

**small business rules as described above, including those specific to the affiliation of**

**businesses for purposes of assessing size.**

67.    Further, graduation from HUB eligibility is specifically tied to the SBA size

standards.  Texas Administrative Code §20.294 references and incorporates the SBA size

standards and states in relevant part:

> (a) A HUB shall be graduated from being used to fulfill HUB procurement
> utilization goals when it has maintained gross receipts or total employment
> levels during four consecutive years which exceed the SBA size standards
> set forth in 13 CFR §121.201 for the following categories
>
> *****
>
> (2) building construction, including general contractors and
> operative builders.

Texas Admin. Code §20.294(a).

68.    Regarding the application of the SBA affiliation rules in particular, it is

noteworthy that, in the context of a 1996 change to the Graduation Procedures, the Notes to the

proposed rule change stated that the agency administering the HUB Program "applies the SBA

industry size standards of total gross revenue and number of employees in determining the

maximum allowed for a concern (<u>including its affiliates</u>) to be considered a HUB." 21 Tex. Reg.

11903 (1996).

69.    The Texas HUB Certification Application includes the following regarding size:

> A business entity is considered ineligible for HUB certification when it
> has maintained gross receipts or total employment levels during four
> consecutive years that exceed the SBA size standards set forth in 13 CFR,
> §121.201. Business entities who achieve the size standards for four
> consecutive years are assumed to have reached a competitive status in
> overcoming the effects of discrimination.

HUB Certification Application, p. 2.

### 3.      HUB Subcontracting Requirements

70.      Subchapter F of the Texas Government Code §2161 governs subcontracting requirements under the HUB Program.  The regulations under this code section specify that HUB subcontracting requirements apply whenever a state agency enters into a contract worth $100,000 or more. Texas Gov't Code §2161.251(a).  In all such instances, the state agency involved must determine whether there is a probability that there will be subcontracting opportunities under the contract.  If the agency so determines, it shall require all bids to include a HUB subcontracting plan.  Texas Gov't Code §2161.252.

71.      When a HUB subcontracting plan is required, the awardee of the contract must make and show a "good faith effort" to comply with its subcontracting plan, which is submitted in order to qualify to receive the award.  Texas Gov't Code §2161.253.  The regulation states:

> (a) When a state agency requires a historically underutilized business subcontracting plan under Section 2161.252, the awarded contract shall contain, as a provision of the contract that must be fulfilled, the plan that the contractor submitted in its bid, proposal, offer, or other applicable expression of interest for the contract. The contractor shall make good faith efforts to implement the plan.
>
> *****
>
> (d) If a determination is made that the contractor failed to implement the plan in good faith, the agency, in addition to any other remedies, may bar the contractor from further contracting opportunities with the agency.

Texas Gov't Code §2161.253(a).

72.      Detailed requirements for HUB subcontracting plans are laid out in the Texas Administrative Code at §20.285.  Subsection (c) enumerates the requirements of the plan itself, including the overall certified HUB subcontracting goal to be met in the contract.  Further, a bidder must include the State agency's HUB goals for its HUB business plan and:

> (A) certification that respondent has made a good faith effort to meet the requirements of this section;

25

(B) identification of the subcontractors that will be used during the course of the contract;

(C) the expected percentage of work to be subcontracted; and

(D) the approximate dollar value of that percentage of work.

Texas Admin. Code §20.285(c).

73.     Texas Administrative Code §20.285(d) lists the methods to be utilized by the bidder to establish its good faith effort in developing its subcontracting plan.  In this context, the bidder must include documentation of "how the respondent negotiated in good faith with qualified HUBs, not rejecting qualified HUBs who were also the best value responsive bidder." Texas Admin. Code §20.285(d)(3)(C).

74.     Subsection (e) of §20.285 establishes that the HUB subcontracting plan, if accepted, "shall become a provision" of the contract.

### 4.     Consequences of Violating HUB Subcontracting Requirements

75.     "If the state agency determines that a submitted HUB subcontracting plan was not developed in good faith, the state agency shall treat that determination as a material failure to comply with advertised specifications, and the subject response (bid, proposal, offer, or other applicable expression of interest) shall be rejected.  Texas Admin. Code §20.285(e).

76.     Prime contractors are required by §20.285(f)(1) to maintain business records documenting compliance with the HUB subcontracting plan and to submit monthly reports of such compliance, which reports shall be a condition of payment under the contract.  Texas Admin. Code §20.285(f)(1).

77.     Subsection (g) of §20.285 requires the monitoring of the HUB subcontracting plan during the performance of the contract, and necessitates amendments to the plan if any

deviations from the plan are intended, prior to their taking effect. This subsection also provides that:

> If a determination is made that the prime contractor failed to implement the HUB subcontracting plan in good faith, the state agency, in addition to any other remedies, may report nonperformance to the comptroller in accordance with §20.585 of this title (relating to Debarment) and §20.586 of this title (relating to Procedures for Investigations and Debarment). In addition, if the prime contractor failed to implement the HUB subcontracting plan in good faith, the state agency may revoke the contract for breach of contract and make a claim against the prime contractor.

Texas Admin. Code §20.285(g)(5).

**C.    The False Claims Act**

78.    This is an action to recover damages and civil penalties on behalf of the United States and Relator arising from the false and/or fraudulent claims, statements, and acts by Defendant made in violation of the False Claims Act, 31 U.S.C. §§ 3729–3733.

79.    The FCA provides, in relevant part, that any person who

(A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)    knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; [or]

(C)    conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G)

is liable to the Government for a civil penalty of not less than $11,181 and not more than $22,363 for each such claim, plus three times the amount of damages sustained by the Government because of the false or fraudulent claims. 31 U.S.C. § 3729(a)(1).

80.    The FCA defines "claim" as

(A)    mean[ing] any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money   or property, that--

      (i)      is presented to an officer, employee, or agent of the United States; or

      (ii)    is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government--

          (I)     provides or has provided any portion of the money or property requested or demanded; or

          (II)    will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . .

31 U.S.C. § 3729(b)(2).

81.    The FCA defines "knowing" and "knowingly" to mean that a person, with respect to information-

      (i) has actual knowledge of the information;
      (ii) acts in deliberate ignorance of the truth or falsity of the information; or
      (iii) acts in reckless disregard of the truth or falsity of the information.

31 U.S.C. § 3729(b)(1)(A).

82.    The FCA allows any persons having knowledge of a false or fraudulent claim against the United States to bring an action in federal district court on behalf of the United States and to share in any recovery as authorized by 31 U.S.C. § 3730.

83.    Further, no proof of specific intent to defraud is required, and an innocent mistake is not a defense to an action under these acts.  31 U.S.C. § 3729(b)(1)(B).

84.    Based on these provisions, Relator, on behalf of the United States, seeks through this action to recover damages and civil penalties arising from Defendants' violations of the False Claims Act.

## VI.    FACTUAL ALLEGATIONS

### Defendants' Fraud on the Government

### A.    The Development of the Scheme

85.    The history of Defendants, both individual and entity, is thoroughly intertwined. Defendant J.W. Turner began his career in the construction business doing residential construction as a sole proprietorship called JW Turner Construction.  In 1994, J.W Turner and Defendant Lauren Turner were married, and Lauren began working in J.W.'s business as an office manager, doing general tasks such as paperwork, accounts payable and receivable, invoicing, etc.  In 1995, J.W. and Lauren formed a limited partnership called Golden Horizons. From the outset, J.W served as the General Partner, CEO, and President of Golden Horizons, and Lauren served as CFO, COO, Office Manager, and a Limited Partner of Golden Horizons.  Also, J.W.'s two children from a prior marriage, Matthew and Tasha Turner, served as Limited Partners.  In 2000, Golden Horizons' name was changed to James W. Turner Construction, Ltd. ("JWTC, Ltd.").

86.    J.W. Turner Construction, Inc. ("JWTC, Inc.") was formed in 1997.  J.W. Turner is President, Chief Executive Officer, Secretary, and Registered Agent of JWTC, Inc., and he controls the company.  Lauren Turner holds the titles Vice President and Chief Financial Officer of JWTC, Inc., but she does very little in relation to this company beyond administrative duties such as paperwork, payroll, and invoicing.  On August 5, 2002, JWTC. Inc. was added as a General Partner in JWTC, Ltd.  JWT Interests, Ltd. was formed on February 1, 2001, JWTC Homes, Ltd. was formed on February 17, 2004, and JWTC-LA, LLC is believed to have been formed on September 28, 2015.  The facts of shared addresses, registered agents, etc. suggest that, like Castlerock, these companies are merely new arms of J.W. Turner's construction business rather than distinct businesses.

29

87.     In sum, the roles that the individual Defendants play in this case are as follows:
(1) J.W. and Lauren Turner are married; (2) J.W. Turner is President, CEO, and General Partner
of JWTC, Ltd. and President, CEO, Secretary, and Registered Agent of JWTC, Inc., (3) Lauren
Turner is CFO, COO, Office Manager, and Limited Partner of JWTC, Ltd.; she is Vice President
and CFO of JWTC, Inc., and she is President, Registered Agent, and Owner/Manager of
Castlerock.  Further, JWTC, Inc. is a General Partner of JWTC, Ltd.  The following chart
illustrates the roles that the Turner family members play in the management of the JWTC, Ltd.,
JWTC, Inc., and Castlerock:

|  | JWTC, Ltd. | JWTC, Inc. | Castlerock |
|---|---|---|---|
| J.W. Turner | President, CEO, and General Partner | President, CEO, Secretary, and Registered Agent | |
| Lauren Turner | CFO, COO, Office Manager, and Limited Partner | Vice President and CFO | President, Registered Agent and Owner/Manager |
| Matthew Turner | Limited Partner | | |
| Tasha Turner | Limited Partner | | |

88.     Over the years following the business's formation, J.W. Turner's construction
business grew substantially.  From its first registration on SAM in 2013, JWTC, Inc. has never
claimed status as a small business.

89.     At some point, likely sometime in the early 2000s, JWTC. Ltd. began bidding on disaster relief construction projects both in Texas and elsewhere.[8]  In fact, one of the primary purposes of  JWTC, Ltd. became to bid on federal and state government contracts for disaster relief construction work.  These contracts typically are funded through the federal government's Community Development Block Grant Program, and JWTC, Ltd. began bidding on and being awarded a number of these contracts as prime contractor.  In Texas, under the HUB regulations delineated above, any of these contracts valued at or above $100,000 are required to comply with the HUB regulations, including by establishing and satisfying HUB subcontracting plans.  One example of a disaster relief construction contract that JWTC, Ltd. was awarded earlier than the contracts at issue in this case is GLO Contract No. 12-473-006, dated August 2, 2012.  (Exhibit 13)  The total value of this contract after completion of all of the six work orders thereunder was approximately $47.5 million ($47,490,018.34).  (Exhibits 14-19).

90.     In 2018 and prior years, the James Turner Defendants awarded their HUB subcontracts to presumably legitimate HUBs, paying out millions of dollars to HUB businesses in the process.  However, some time prior to April of 2018, Defendants came up with a plan by which they could keep those millions of dollars for themselves.  The lynchpin of this plan was the creation of a sham HUB entity – Castlerock – through which that money could be funneled back to Defendants.

91.     Castlerock was formed in April 2018 with Lauren Turner listed as sole Owner/Manager, President and Registered Agent.  Defendants then applied for HUB certification for Castlerock based on Lauren's status as a woman.  In this process, Castlerock and

---

[8] In some instances, a new entity was formed in order to facilitate such disaster recovery work in new locales such as Florida and Puerto Rico.  For instance, for work in Puerto Rico, Lauren Turner originated a company called Capomastro, LLC which was formed in Texas in 2018.  (Exhibit 33)

Lauren Turner were represented to satisfy all of the requirements for HUB certification.  But because Castlerock was and still is affiliated with the James Turner Defendants, it is not a "small" business.  It therefore is not an eligible HUB because it is not and has never been economically disadvantaged.  Defendants all knew these facts, but they misrepresented Lauren Turner's qualifications as an eligible HUB owner and Castlerock's size in order to pursue a fraudulent HUB certification.  Based on these misrepresentations, Castlerock received certification as a HUB in December 2018.

92.    In furtherance of their scheme, after Castlerock was formed, Defendants had all of the employees and independent contractors who had been working for JWTC, Ltd., including Relator, sign paperwork by which their employment was transferred to Castlerock (herein "Transfer Documentation").  (Exhibit 1)  Relator signed the Transfer Documentation on January 29, 2019.  The plan was for Castlerock to "lease" those employees back to the James Turner Defendants.

93.    The Transfer Documentation included a non-disclosure agreement ("NDA").  *Id.* at pp. 3-11.  Significantly, this NDA was entered into by Castlerock "on behalf of itself and its clients (collectively referred to herein as the 'Company Group')."  Castlerock's "Clients" are distinct in the NDA from the Company Group's "customers," although the NDA does not explain this distinction.  *Id*. at p. 7, ¶10.  Also, the NDA allows the assignment of "this Agreement to any subsidiary or corporate affiliate in the Company Group or otherwise."  *Id*. at p. 9, ¶13.  A separate agreement within the Transfer Documentation, "Agreement Regarding Work Assignments," lists the Clients for whom Castlerock's employees "may be assigned to provide services."  *Id*. at p.15.  The entities listed are (1) James W. Turner Construction, Ltd., (2) JWTC Homes, Ltd., (3) James W. Turner Construction, Inc., (4) JWT Interests, Ltd., (5) JWTC-LA,

LLC, and (6) JW Turner Construction, Inc.  These facts – that the Transfer Documentation treats Castlerock and its clients as one entity, and that it defines Castlerock's clients to include only entities that are associated with Defendants – illustrate that Castlerock and the James Turner Defendants in effect were working as one entity and holding themselves out as such.

94.    There is a single contract between JWTC, Ltd. and Castlerock that purports to have Castlerock "lease" employees to JWTC, Ltd.  But this "leasing" contract gives Castlerock incredibly broad responsibilities, at least on paper.  Under this contract , which Lauren Turner describes as an "employee leasing agreement," Castlerock purports to perform virtually all of the activities in which any of the James Turner Defendant business entities engage.  The contract says that Castlerock performs:

        a.  Staffing;

        b.  Payroll servicing;

        c.  ALL subcontract management;

        d.  All hiring;

        e.  All invoicing;

        f.  Preparation of all RFP responses;

        g.  Managing the dormitory-style housing where workers stayed in Victoria, Texas, at the job site;

        h.  Employing all employees associated with Turner work, including managing all independent contractors.  In fact, all Turner personnel are leased from Castlerock; there is a **total** sharing of employees.

If Castlerock were to actually do everything the contract asserts, including preparing RFP responses and managing all subcontracts, there would be little to nothing left for JWTC, Ltd. or JWTC, Inc. to do.  Castlerock actually does payroll, but otherwise these activities are performed by those formally employed by Castlerock, but functionally working for (and formally leased to) the James Turner Defendants.

95.    Also, some of the NAICS codes under which Castlerock has registered with the federal government are construction codes.  Defendant Castlerock has selected four different NAICS codes to cover the work that the company alleges that it does:

236115 - New Single-Family Housing Construction (except For-Sale Builders);

236118 - Residential Remodelers;

561210 - Facilities Support Services; and

561320 - Temporary Help Services.

96.    The first two codes, 236115 and 236118, are specific to construction, which suggests Defendants were attempting to cast Castlerock as a construction company.  On the other hand, these two codes are inappropriate for a payroll company or a staffing company, which is the core function Castlerock appears to have.

97.    On the other hand, the other two codes that Castlerock adopts, 561210 and 561320, are not construction related.  Code 561210 – Facilities Support Services is intended for companies that provide support for their clients ("such as janitorial, maintenance, trash disposal, guard and security, mail routing, reception, laundry, and related services") but "are not involved with or responsible for the core business or activities of the client." https://www.naics.com/naics-code-description/?code=561210.  Thus, Code 561210 is not construction related but is not really payroll services either.  It is intended to apply to functions in which no one has ever suggested Castlerock engages.

98.    Code 561320 is intended to encompass companies that provide temporary employees to their clients, and can apply to staffing companies in the construction industry." https://www.naics.com/naics-code-description/?code=561320.  Thus, this code is more akin to

Castlerock's purported functions than the other codes the company uses. After all, Lauren Turner claims experience in administrative functions but denies any construction knowledge. However, neither Code 561210 nor 561320 encompasses payroll services, Castlerock's major contribution.

99.     Significantly, Castlerock does not claim NAICS Code 54124 – Payroll Services. This code is intended for entities engaged in "(1) collecting information on hours worked, pay rates, deductions, and other payroll-related data from their clients and (2) using that information to generate paychecks, payroll reports, and tax filings." https://www.naics.com/naics-code-description/?code=541214. It appears that Defendants may have avoided this payroll servicing code because it is not really an appropriate function to subcontract – payroll is more an overhead service to the prime contractor than a function that a prime would subcontract out on a particular project. Therefore, using the payroll code could have raised a red flag that Castlerock was not an appropriate HUB subcontractor on JWTC, Ltd.'s contracts with the GLO.

100.     Also, it is significant that Castlerock rarely if ever staffed or provided payroll services for any company other than JWTC, Ltd., and nothing whatsoever changed about the operation of the James Turner Defendant entities after the formation of Castlerock. JWTC, Ltd.'s employees – both those who had been with J.W. Turner for years and years, and newer workers like Relator – continued working on the same JWTC projects in the same capacities as before, with the same hierarchy as before, being directed and controlled ultimately by J.W. Turner as before. They also continued to use JWTC equipment, wear JWTC uniforms, and use JWTC email addresses.

101.     The only persons known to be actually doing any work for Castlerock are Lauren Turner herself, an accountant, and perhaps Marjuana Williams, an attorney. Ms. Williams and

the accountant are believed to be independent contractors who also perform work for the James Turner Defendants.  With the exception of Castlerock, which purports to operate out of the Turners' home, all of the Turners' businesses have their offices at 14215 Mary Jane Lane in Tomball, Texas.

102.    Lauren Turner's role in running Castlerock is remarkably minimal.  Even if one assumes that Castlerock legitimately performs staffing and payroll duties, those duties are virtually identical to what Lauren was doing for the James Turner defendants prior to Castlerock's formation.  Moreover, today Lauren has an accountant – the same one she used prior to Castlerock's existence – prepare payroll.  Lauren merely signs off on it.  Beyond that, Lauren does next to nothing for the company.  She works out of her home, and payroll is made to the very same set of employees as before Castlerock was formed – the construction workers J.W. Turner uses to operate his construction business.  It does not even appear that Lauren draws an income from Castlerock.

103.    In fact, Castlerock was and is nothing but a front for the James Turner Defendants.  Castlerock was formed for the purpose of being the vehicle by which Defendants could "satisfy" their HUB obligations while siphoning those HUB funds back to themselves.

### B.    The Application of the Scheme to the Contracts at Issue

104.    The earliest two contracts at issue in this case, GLO Contract No. 18-179-001 and GLO Contract No. 19-094-007, were awarded to JWTC, Ltd. before Castlerock was formed.  In the Subcontracting Plan that accompanied JWTC, Ltd.'s bid for GLO Contract No. 18-179-001, JWTC, Ltd. asserted that it was planning to award 22% of the contract to HUB subcontractors, which would mean approximately $6.6 million of that contract's payments would go to those HUBs.  Relator assumes that the HUBs listed in this Subcontracting Plan did in fact receive payments under this contract during 2018.

36

105.    JWTC, Ltd. received three more CDBG-funded contracts after Castlerock was formed – GLO Contract Nos. 19-070-006, 21-088-001-C748, and 21-076-001-C743.  In order to be eligible for these contracts, JWTC, Ltd. was required to submit HUB Subcontracting Plans, but because JWTC, Ltd. intended from the outset to divert most of the HUB subcontract dollars under these prime contracts to Castlerock, which it knew was not a legitimate HUB, all three of these contracts were fraudulently induced through explicitly false representations that Castlerock intended to use good faith efforts to satisfy those subcontracting plans.

106.    JWTC, Ltd.'s Monthly Progress Reports to the GLO reveal that, after Castlerock was formed and certified as a HUB in December 2018, JWTC, Ltd. abruptly began funneling the vast majority of the HUB work under all of its CDBG-funded contracts to Castlerock. Castlerock only began operations at the beginning of 2019, and from January through May of that year, Castlerock and Marjuana Bush Williams, PLLC were the only HUB subcontractors reported on Work Orders B531 and B533 of Contract No. 19-094-007.[9]  Castlerock alone was reported on those Work Orders in June 2019 and on Work Order B531 in July 2019. Furthermore, despite adding some other HUBs to its roster on this contract in the second half of 2019, Castlerock still was accounting for close to 90% of JWTC, Ltd.'s HUB subcontracting as of June 2020.  The timing and the completeness of the move by JWTC, Ltd. to shift its HUB payments to Castlerock shows the purpose behind Castlerock's formation.  Once Castlerock was

---

[9] Marjuana Bush Williams, PLLC is the law practice operated by Marjuana Williams, who has done other legal work for Defendants over the years, including serving as organizer in the creation and registration of Castlerock. The HUB certification of Marjuana Bush Williams, PLLC is not at issue in this case.  However, JWTC, Ltd.'s award of HUB subcontracts to this entity under this prime contract is likely inappropriate nonetheless since legal work would be a service to the prime entity rather than sub-work under the construction contract.  Therefore, these contracts, valued at a total of $300,000, may have been draining additional monies away from legitimate HUBs much like the subcontracts JWTC, Ltd. awarded to Castlerock.

formed and fraudulently certified as a HUB, the Defendants put it immediately to work stealing HUB monies for Defendants.

107.    The flipside of this coin is that virtually all of Castlerock's business has come from the James Turner Defendants.  During the entire first year of Castlerock's operations, 2019, Castlerock had only one client – JWTC, Ltd. – which paid more than $2.25 million in that year to Castlerock.  Castlerock had at most a couple of other clients in 2020, but there is no reason to think that they made up more than an inconsequential percentage of Castlerock's business, or to think that Castlerock was functioning as anything other than an instrumentality or affiliate of the James Turner defendants.

108.    In effect, Castlerock and the James Turner Defendants are one and the same; they are affiliated businesses, and because of that affiliation, the Turner Defendants are fraudulently taking HUB subcontracts for themselves even though they do not qualify as HUBs.  The awarding of HUB subcontracts to Castlerock is entirely fraudulent.

**C.    Defendants are Affiliated Under the Meaning of Federal and State Government Regulations, and Therefore Castlerock Is Not a Qualified HUB.**

109.    The affiliation rules and regulations of the HUB Program and the federal SBA leave no doubt that the Defendant entities are affiliated and that Castlerock therefore cannot qualify as a HUB.  This is so first, and most obviously, because the owners of each entity, J.W. Turner and Lauren Turner, are married.  It is also true because of Castlerock's economic dependence on the James Turner Defendants and the fact that Castlerock is a "newly organized concern" of the James Turner Defendants.  Further, this affiliation between the Defendants under federal standards disqualifies Lauren Turner from being a HUB owner and Castlerock from being a HUB because the businesses together are too large for Turner to meet definitions of "active participant" and "economically disadvantaged" required for her HUB ownership.  The

bottom line is that Castlerock is a purpose-built, sham HUB rather than a legitimate going concern.

       1.    **Federal Regulations Establish Affiliation.**

       a.    **The SBA Spouse Rule Presumes Affiliation Between Castlerock and the James Turner Defendants Because of Lauren and J.W. Turner's Marriage.**

110. First, affiliation between Castlerock and the James Turner Defendants is firmly established by the simple fact of Lauren and J.W. Turner's marriage. Furthermore, under the more specific affiliation rules in either 13 C.F.R. §121.103(f), "Affiliation based on identity of interest," or (g), "Affiliation based on the newly organized concern rule," the Defendant entities must be presumed affiliates. Under 13 C.F.R. §121.103(f)(1), affiliation is presumed between married couples "if they conduct business with each other, such as subcontracts or joint ventures or share or provide loans, resources, equipment, locations or employees with one another." Defendants in this case meet all of these factors; they conduct business together, they subcontract one to the other, and they share resources, equipment, locations, and employees. Therefore, affiliation is presumed.

       b.    **Castlerock and the James Turner Defendants Are Economically Dependent and Therefore Presumed to be Affiliated.**

111. Second, 13 C.F.R. §121.103(f)(2) presumes identity of interest based upon economic dependence. Such economic dependence is established "if the concern in question derived 70% or more of its receipts from another concern over the previous three fiscal years." Here, since virtually all of Castlerock's business comes via JWTC, Ltd., Castlerock has received more like 98% of its income from the James Turner Defendants -- certainly far in excess of the 70% threshold established in the regulation. Therefore, the presumption of affiliation for economic dependence is triggered as well.

     **c. Castlerock was Organized by J.W. and Lauren Turner in the Same Industry as JWTC, Ltd. and JWTC, Inc., and Therefore is a "Newly Organized Concern" and Affiliated with JWTC, Ltd. and JWTC, Inc. as Such.**

112.    13 C.F.R. §121.103(g) is similarly conclusive as to affiliation between the Defendant entities.  This provision presumes affiliation when "officers, directors, principal stockholders, managing members, or key employees" of one concern organize another concern in the same or a related industry and then serve in similar capacities in the latter, and the former concern provides contracts, assistance, facilities, etc. to the new concern.  13 C.F.R. §121.103(g).  In this case, Defendants J.W. and Lauren Turner were principals of the former concerns – JWTC, Ltd. and JWTC, Inc. – bringing the formation of Castlerock within the scope of this rule.  They then formed Castlerock together and proceeded to provide Castlerock with virtually all of its business.  Therefore, this rule establishes affiliation via a third avenue.

     **d. J.W. Turner Has the Power to Control and In Fact Does Control Castlerock, and Therefore Castlerock is Affiliated with the James Turner Defendants.**

113.    Finally, the general principle of affiliation found in 13 C.F.R. §121.103(a) alone is enough to establish affiliation in this case.  That subsection provides that "Concerns and entities are affiliates of each other when one controls or has the power to control the other…."  In fact, "[i]t does not m atter whether control is exercised, so  long as the power to control exists."  Defendant J.W. Turner and his companies, JWTC, Ltd. and JWTC, Inc., have both the power to control and in fact do control virtually all aspects of Defendant Castlerock.  Therefore, affiliation between the entities is clear.

114.    The conflation of roles between the Business Entity Defendants as discussed above supports the fact of their affiliation as well; in many ways they simply ARE one business.  Through the transfer – on paper, not in fact – of all employees of JWTC, Ltd. and JWTC, Inc. to

Castlerock in the Fall of 2019, Defendants share employees completely, and all of these employees continue to work on JWTC projects with the same responsibilities as before the change, using JWTC equipment, wearing JWTC uniforms, using JWTC email addresses, and answering to JWTC supervision.

### 3. Texas HUB Regulations Disqualify Castlerock Because of Its Affiliation with the James Turner Defendants Under Federal Law.

#### a. Size Standards in Texas HUB Regulations Incorporate the Above Federal SBA Standard for Affiliation, and Therefore Castlerock's and the James Turner Defendants' Assets Must be Added in Applying Texas HUB Size Standards

115.    As noted above, Texas Administrative Code §20.282(29) defines its HUB graduation standards by incorporating by reference the SBA size standards and asserting that those standards are to be used in determining whether a business is "graduated" from HUB eligibility.  In other words, the HUB Program looks to the SBA size standards to determine whether a business is too large to qualify for HUB certification.  Because the SBA size standards require affiliated businesses to combine assets in determining a business's size, the HUB Program necessarily requires the same.  Therefore, Castlerock and the James Turner Defendants' assets must be combined in order to assess HUB eligibility, and once this is done, Castlerock is too large a business to be a HUB.

#### b. Under the HUB Program's Requirement of Active Participation by a HUB Owner, Facts Showing Affiliation Between the Defendants Disqualify Lauren Turner as a HUB Owner.

116.    Active participation in the business by an eligible owner is required for HUB certification.  Texas Gov't Code §2161.001(2).  According to Texas Administrative Code §20.283(a)(10), affiliation between businesses should be considered in the context of determining whether a proposed HUB owner engages in enough "active participation" to meet this standard.  Specifically, §20.283(a)(10) directs the consideration of "whether and to what

extent the HUB business shares management, board members, partners, employees, or other resources with another business in amounts or ways which might indicate that they are related or affiliated businesses" in making the active participation determination.  Castlerock, JWTC, Ltd., and JWTC, Inc. unquestionably share management, board members, partners, and employees to a huge extent, certainly to such an extent that affiliation between them is indicated.  Under this regulation, then, Lauren Turner is disqualified from being a legitimate HUB owner, and Castlerock is disqualified from being a legitimate HUB.

> ### c. Because of Affiliation, Lauren Turner and Castlerock Also Cannot Meet the Requirement of Economic Disadvantage By Virtue of Size and Therefore Do Not Qualify for HUB Certification.

117.    Even if Lauren Turner were considered an active participant, Castlerock's affiliation with the James Turner Defendants would disqualify her eligibility as an owner due to the size of the business.  The HUB Program also requires that a HUB owner be economically disadvantaged.  "Economically disadvantaged" means that the otherwise eligible HUB owner's business has not exceeded the graduation size standards according to the comptroller's graduation procedures in §20.294 of this title (relating to Graduation Procedures. Texas Admin. Code §20.282(8).  Castlerock exceeds the graduation standards of the HUB Program by way of its affiliation with the James Turner Defendants and therefore also fails to meet the regulatory definition of "economically disadvantaged."

> ### D. Castlerock's Affiliation with the James Turner Defendants Means That All Representations that Castlerock Made to the Government Regarding Being a Small Business and a Legitimate HUB and its Satisfaction of its HUB Obligations Were False.

118.    Because Castlerock was and is affiliated with the James Turner Defendants, Defendants' representations to the SBA in the context of registering Castlerock on the System for Award Management ("SAM") that Castlerock was a small business concern were false.

42

Similarly, Defendants' representations to the Comptroller of Texas in the context of applying for

and maintaining HUB certification for Castlerock – that Lauren Turner was an eligible owner of

a HUB and that Castlerock was economically disadvantaged such that it could be a legitimate

HUB – also were false.  Finally and most importantly, Defendants' representations to the GLO

that JWTC, Ltd. planned to and did use good faith efforts to satisfy, and in fact did satisfy, its

HUB obligations under those contracts, also were false.  These misrepresentations rendered all

claims for payment that Defendants made under those contracts false, and these false claims are

violations of the False Claims Act.

### 1.    Misrepresentations to the Federal Government

119.    Defendants JWTC. Ltd. and Castlerock each have registered to do business on the

federal government's SAM system.[10]  JWTC, Ltd.'s SAM registration does not claim and has

never claimed status as a small business, as it cannot.  (Exhibit 20)  Significantly, Defendant

Castlerock, which originally registered with SAM on May 31, 2019, is registered both as a

woman-owned business and as a "small business," which is simply not true due to its affiliation

with a large business.  A copy of Castlerock's most recent SAM registration is attached hereto as

Exhibit 21.  In order to secure SAM registration, Lauren Turner necessarily made numerous

representations and certifications, including that Castlerock met all the requirements to qualify as

a small business under SBA rules and regulations. 13 C.F.R. §§121.103 and 121.201.  It did not

meet those requirements.  Further, neither Castlerock nor Lauren Turner has made any

disclosures of any kind regarding Castlerock's relationship to and affiliation with Defendants

JWTC, Ltd. and JWTC, Inc.

---

[10] Defendant James W Turner Construction, Ltd.'s DUNS # is 830273111, and its Texas Identification Number ("TIN") is 17604784870; Defendant Castlerock Resources, LLC's DUNS # is 116993764.

120.    Aside from the FCA, the consequences of misrepresenting a company's size to the SBA also are severe.  It is a federal crime to "misrepresent[] the status of any concern or person as a 'small business concern' … in order to obtain for oneself or another any" prime contract or subcontract.  15 U.S.C. §645.  Included in the actions that are deemed to be "affirmative, willful, and intentional certification of small business size and status" are: submitting bids for federal grants, contracts or subcontracts that  intended for small businesses, and registration on  any federal database such as SAM  for the purpose of being considered for federal grants, contracts, or subcontracts as a small business.  In connection with the contracts at issue, Castlerock submitted a number of bids for federal subcontracts intended for small businesses and therefore affirmatively, willfully and intentionally falsely certified its small business size and status has therefore committed numerous crimes both in registering as small on the SAM system and in fraudulently representing that it is a legitimate small business in order to be considered for contracts funded with federal monies such as the ones at issue in this case.

### 2.    Misrepresentations to the Texas Comptroller in the Application for HUB Certification

121.    In applying for HUB certification, Defendants were required to affirm under penalty of perjury that Castlerock met the qualifications for certification.  Texas Admin. Code §20.288(a).  Because of Castlerock's affiliation with the James Turner Defendants, that affirmation necessarily was false.

122.    As discussed above, under Texas Administrative Code §20.283(a)(10), the affiliation between Defendants leads to the conclusion that Lauren Turner does not actively participate in the business to the extent necessary, and therefore she is not a qualified HUB owner.

44

123.     Also because of its affiliation with the James Turner Defendants, Castlerock has never been "economically disadvantaged" by Lauren Turner's gender as is required by Texas Government Code §2161.001 and Texas Administrative Code §20.282.

124.     In addition, because Castlerock is affiliated with the James Turner Defendants, Castlerock is graduated from eligibility as a HUB.  Texas Admin. Code §§20.282(29) and 20.294(a).

125.     Thus, Defendants' certifications of Castlerock's HUB eligibility were false.  Had the Comptroller been aware of these false representations, Castlerock would not have received its HUB certification and could not have been awarded the subcontracts that it obtained under the contracts at issue.  Castlerock's HUB certification was fraudulent.

### 3.     Misrepresentations to the GLO Under the Specific Contracts at Issue

126.     Once attained, Defendants put their fraudulent HUB certification of Castlerock to work for their benefit right away, and they made many misrepresentations in order to fraudulently induce and keep the five contracts identified herein.

127.     The GLO released Requisition # X0013720-AW in mid-2017 in order to contract for Hurricane Harvey disaster recovery residential construction.  A copy RFQ X0013720-AW is attached hereto as Exhibit 22.  The GLO subsequently provided its HUB Subcontracting Probability Statement for this requisition, stating that "[i]t has been determined by the Agency that there are probable subcontracting opportunities in the scope of the work for this proposal or offer."  Therefore, the GLO required a HUB subcontracting plan from all respondents.  If no HUB subcontracting plan was provided, the respondent's submission would be "rejected as a material failure to comply with advertised specifications."

128.     In Article 5 of RFQ X0013720-AW, "Required Respondent Information," all applicants are required to provide a "company profile" which, inter alia, includes:

The company ownership structure (corporation, partnership, LLC, sole proprietorship), including any wholly-owned subsidiaries, <u>affiliated companies</u>, or joint ventures…. If Respondent is an Affiliate of, or has a joint venture or strategic alliance with, another company, please identify the percentage of ownership and the percentage of the parent's ownership. Finally, please provide your proposed operating structure for the services requested under this Solicitation and which entities (i.e. parent company, Affiliate, Joint Venture, subcontractor) will be performing them.

*Id*. at p. 17, §5.1.2(a) (emphasis added).

129.    RFQ X0013720-AW separately requires applicants to identify any "major subcontractors" who are proposed to perform 15% or more of the work and to disclose any financial interest Respondent holds in such major subcontractor.  Further:

It may be required as a condition of award that an authorized officer or agent of each proposed major subcontractor sign a statement to the effect that the subcontractor has read, and will agree to abide by, Respondent's obligations under any contract awarded pursuant to this Solicitation.

*Id*. at p. 18-19, §5.3.

130.    The other RFPs under which JWTC, Ltd. was awarded Hurricane Harvey construction contracts contain virtually identical provisions on all of these points.  See RFP X0014978-AW, dated May 22, 2018 and attached hereto as Exhibit 23, and RFP X0018181-RS, dated August 2, 2019 and attached hereto as Exhibit 24.

131.    Relator believes that JWTC, Ltd. handled its responses to all of the RFQs and RFPs in much the same manner.  Without the actual bids that JWTC, Ltd. submitted, though, it is not certain whether JWTC, Ltd. disclosed Castlerock as an affiliate or even as a "major subcontractor" in its bids, but Relator believes such disclosures highly unlikely.  In addition, had it made such disclosures, it is unlikely that JWTC, Ltd. would have been awarded these contracts since the Subcontracting Plans associated with each bid would have asserted that JWTC, Ltd.'s HUB obligations would be satisfied by subcontracting to Castlerock.

46

132.     All of the contracts at issue in this case contain specific provisions requiring compliance with "all applicable federal, state, county, and city laws, statutes, ordinances, and regulations." *See, e.g.*, Exhibit 10 at p. 18, §8.09.  They also specifically note the contractor's obligation to provide and comply with a HUB subcontracting plan, *see, e.g., Id*. at pp. 17-18, §8.07, and require written notification of any subcontractors performing 15% or more of the work under the contract, *see, e.g., Id*. at p. 17, §8.06.  Signing the contracts constitutes certification that the provider is in compliance with all general affirmations and specific federal requirements and laws as detailed in attachments to the contracts.  *See, e.g., Id*. at p. 9, §§4.02 and 4.03.

133.     Furthermore, four of the five contracts at issue incorporate a set of Uniform General and Supplemental Conditions which include specific covenants to "continue to comply with the HUB Program" by way of certain actions and a notation of the requirement to demonstrate a good faith effort to fulfill the contractor's Subcontracting Plan.  (Exhibit 4, GLO Contract No. 19-094-007) at Attachment D-1, §17.2 Compliance with Approved HUB Subcontracting Plan; Exhibit 2 (GLO Contract No. 18-179-001) at §1.03 (referencing the incorporation by reference of the Uniform General Conditions); Exhibit 12 (GLO Contract No. 21-076-001) at Attachment D, §17.2; and Exhibit 11 (GLO Contract No. 21-088-001) at Attachment D §17.2.)  Defendants violated these covenants by misrepresenting that their subcontracting with Castlerock satisfied its HUB obligations and failing to make a good faith effort to comply with their HUB subcontracting plans.

134.     JWTC, Ltd. submitted a HUB subcontracting plan on October 16, 2017 accompanying its bid in response to Requisition # X0013720-AW.  JWTC, Ltd. was awarded a contract pursuant to this bid, GLO Contract No. 18-179-001 (Exhibit 2), for residential

construction repair services for disaster recovery. Therefore, this subcontracting plan is incorporated into that contract.

135.    In its HUB subcontracting plan of October 16, 2017, JWTC, Ltd. acknowledged that the statewide HUB goal for all building construction, and therefore the goal for this project, was 21.1 percent. A copy of this subcontracting plan is attached as Exhibit 25. *See also* Texas Admin. Code §20.284, which sets the statewide HUB goals.

136.    As discussed above, JWTC, Ltd. is bound by Texas law to use good faith efforts to develop and comply with any subcontracting plan. Any changes to the plan were required to be submitted to the GLO for approval and also were bound by the good faith standard. JWTC, Ltd. cannot meet this good faith standard because the plan from the beginning was to form Castlerock and substitute it for legitimate HUB businesses and thereby siphon off federal dollars from those HUBs to their own pockets fraudulently.

137.    In its monthly HUB progress reports regarding GLO contracts 18-170-001 and 19-094-007, Defendant JWTC, Ltd. reveals the fruition of its scheme. Relator can provide the following compliance reports and attaches these hereto as exhibits as follows:

      a.   18-179-001 WO A847 Progress Assessment Reports for Jan.-Aug. 2018. (Exhibit 26)

      b.   18-179-001 WO A881 Progress Assessment Report for Jan.-Aug. 2018. (Exhibit 27)

      c.   19-094-007 WO B531 Progress Assessment Reports for Jan.-Jul. 2019 and Sep. 2019-Jun. 2020. (Exhibit 28)

      d.   19-094-007 WO B532 Progress Assessment Reports for Mar.-Jun. 2020. (Exhibit 29)

      e.   19-094-007 WO B533 Progress Assessment Reports for Jan-Jul 2019 and Sep. 2019-Jun. 2020. (Exhibit 30)

      f.   19-094-007 WO C418 Progress Assessment Reports for Apr.-Jun. 2020. (Exhibit 31)

138.    For GLO Contract No. 18-179-001, the progress reports to which Relator has access cover January through August of 2018 (a and b above).  JWTC, Ltd. asserts in those reports that it was subcontracting to five different HUBs for a total of approximately $5.25 million in payments to these HUBs as of the end of August 2018.

139.    As of June 2020, JWTC, Ltd. was asserting that it "satisfied" its HUB obligations for GLO Contract No. 19-094-007 with $16,620,000 in subcontracts with Castlerock and $2,117,000 in subcontracts with other HUBs.  This means that at best under this contract, only 11.3% of the total HUB subcontracting dollars that JWTC, Ltd. was paying was going to actual HUBs, and almost 89% of those dollars was going back into the Defendants' pockets.  The total dollars being fraudulently diverted to Defendants under just this contract were in excess of $16 million as of June 2020.

140.    Defendants made misrepresentations in all of the Progress Assessment Reports for the contracts at issue in every instance where they listed Castlerock as a HUB subcontractor. Because Castlerock is not a legitimate HUB, Defendants cannot establish that they have complied with their HUB obligations in good faith.  All representations to the contrary have been false.

141.    The table at Exhibit 32, compiled by counsel, illustrates the breadth of Defendants' fraud.  Gleaning information from JWTC's available progress reports, this table shows the amounts paid to JWTC, Ltd. by the GLO under these contracts, the amounts that JWTC, Ltd. in turn paid to HUB subcontractors under those contracts, and, of the latter amounts, how much was paid to Castlerock in particular.  Thus, one can see a running total of HUB subcontracting dollars being diverted to Castlerock in comparison with total dollars JWTC, Ltd. paid for HUB sub work.  In numerous months, Castlerock was the only or one of two

subcontractors to receive any HUB dollars, including January-July 2019 and April 2020. Further, by comparing the data in the fifth and seventh columns of this table, it is clear that, in most of the months here delineated, Castlerock received the vast majority of the HUB dollars being spent by JWTC, Ltd. in that month.

142.    It should not be overlooked that, in fact, there are no actual subcontracts between Castlerock and JWTC, Ltd.  The only contract that does exist between the companies is an employee leasing agreement.

143.    Defendants had a duty to correct misrepresentations to the GLO and/or to the SBA that Castlerock was a legitimate HUB and/or that it qualified as a "small business" under SBA regulations as to the relevant NAICS codes.  They never made these corrections.

144.    If the Texas Comptroller had known that Castlerock was not a legitimate HUB at the time it submitted it application for HUB certification, then that application would have been rejected.  Furthermore, if the Comptroller were to determine that Castlerock did not qualify as a HUB at any point after initial certification, then the Comptroller would revoke that certification and would have the ability to bar Castlerock from participation in GLO contracts.   Texas Gov't Code §2161.253(a); Texas Admin. Code §20.285(g)(5).

145.    Similarly, if the GLO had known that JWTC, Ltd. was misrepresenting its HUB subcontracting by means of its scheme with Castlerock, then the GLO would have rejected the Subcontracting Plan that JWTC, Ltd. submitted with its bid on GLO contracts.  As a result, JWTC, Ltd. would not have received the disaster relief contracts that it was awarded based on that illegitimate subcontracting plan.

### E.    Defendants' Fraudulent Scheme Defrauded the Government of Millions of Dollars.

146.    Castlerock has received millions of dollars of HUB-intended dollars under the contracts it fraudulently obtained and maintained in this case.  For example, under contract 19-094-007, in June 2020 alone, Castlerock received $1,224,470 – under just Work Order B531.  As of the end of June 2020, Castlerock had received a total of $16,043,795 under all of the Work Orders then operative for just that contract.

147.    The United States has been damaged by the Defendants' false certifications regarding its size and eligibility for HUB certification, which led to the breaching of two contracts with the GLO that had been obtained prior to Castlerock's formation and to the fraudulent inducement of three additional contracts acquired after that formation  As a result, all claims for payment from January 2019 forward under all five contracts identified herein are false.

148.    Under the Presumed Loss Rule, which mandates that a size misrepresentation to the SBA results in damages measured by the full amount of the fraudulently obtained contract, the value of the contracts fraudulently obtained by JWTC, Ltd. in this case establish single damages in the approximate amount of $191.1 million.

149.    The United States Supreme Court's ruling in *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943), has been recognized as establishing the "fraud-in-the-inducement" theory as actionable under the False Claims Act.[11]  Courts have found defendants liable under the False Claims Act for each claim submitted to the Government under a contract when that contract was obtained originally through false statements or fraudulent conduct.[12]  For instance, in *Hooper v.*

---

[11] *Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012).
[12] *See, e.g.*, *United States ex rel. Longhi v. Lithium Power Technologies, Inc.*, 575 F.3d, 458, 467-68 (5th Cir. 2009) (alleged false statements in grant proposals sufficient to trigger FCA liability, even if claims for payment were not

*Lockheed Martin Corp.*, 688 F.3d 1037, 1048 (9th Cir. 2012), the court held that "false estimates, defined to include fraudulent underbidding in which the bid is not what the defendant actually intends to charge, can be a source of liability under the FCA claim, assuming that the other elements of an FCA claim are met."  The contractor's fraudulent act of intentionally underbidding a contract taints the formation of a Government contract.  And, as the Supreme Court held in *Hess*, "[I]ts taint entered into every swollen estimate which was the basic cause for payment of every dollar paid by the government."[13]  The request for payment in such circumstances is a demand on the Government that makes the fraudulent low bid actionable under the False Claims Act.

150.    Here, likewise, Defendants fraudulently induced the United States to award three of the contracts at issue to JWTC, Ltd.  JWTC, Ltd. falsely represented in its bid for these contacts that its subcontracting plan satisfied the GLO requirements when it knew that it did not because of its scheme to substitute its affiliate, Castlerock, for legitimate HUB businesses.

151.    The Government relied on these representations in awarding the contracts to JWTC, Ltd., when otherwise it would have awarded the contract to another bidder that submitted a legitimate HUB subcontracting plan.

152.    The Government has been damaged in an amount to be proved at trial which will be comprised of all payments made to Defendants from January 2019 forward under the earliest two contracts at issue, and all payments made to Defendants at any time under the three contracts fraudulently induced.

---

alleged to be false or fraudulent.); *United States ex rel. Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776 (4th Cir. 1999) (Fraud-in-the-inducement cases find FCA liability for each claim submitted when contract was originally obtained through false statements or fraudulent conduct.).
[13] *Hess*, 317 U.S. at 543 (1943).

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Presentation of False or Fraudulent Claims**
**31 U.S.C. § 3729(a)(1)(A)**

153.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

154.    From January 2019 to the present, Defendants James W. Turner Construction, Ltd., J.W. Turner Construction, Inc., JWTC Homes, Ltd., James W. Turner Construction, Inc., JWT Interests, Ltd., JWTC-LA, LLC, Castlerock Resources, LLC, James W. Turner and Lauren Turner have knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United States.

155.    Defendants' knowing submission, or causation of submission, of false or fraudulent claims had the potential to influence the Government's payment decisions and was material to the Government's decisions to pay the claims.

156.    The United States paid the false and fraudulent claims.

157.    Defendants' presentment, or causation of presentment, of false or fraudulent claims was a foreseeable factor in the United States' loss and a consequence of Defendants' schemes.  Due to Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### SECOND CLAIM FOR RELIEF
**Making or Using False Records or Statements Material to False or Fraudulent Claims**
**31 U.S.C. § 3729(a)(1)(B)**

158.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

159.    Defendants James W. Turner Construction, Ltd., J.W. Turner Construction, Inc., JWTC Homes, Ltd., James W. Turner Construction, Inc., JWT Interests, Ltd., JWTC-LA, LLC,

Castlerock Resources, LLC, James W. Turner and Lauren Turner have knowingly made, used, or caused to be made or used, false records or statements material to false or fraudulent claims.

160.    The false statements or records also consist of false certifications or representations made or caused to be made by Defendants to the State government of Texas and the United States government.

161.    Through these false statements or records, Defendants knowingly and repeatedly violated the False Claims Act, 31 U.S.C. §3729(a)(1)(B).

162.    Defendants' making or use of false records and statements, or causation of use of false records and statements, had the potential to influence the Government's payment decisions and were material to the Government's decisions to pay the claims.

163.    The United States paid the false and fraudulent claims.

164.    Defendants' false statements or records, or causation of false statements or records, were foreseeable factors in the United States' loss and a consequence of Defendants' schemes.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### THIRD CLAIM FOR RELIEF
### Conspiracy to Violate the False Claims Act
### 31 U.S.C. § 3729(a)(1)(C)

165.    Relator realleges and hereby incorporates by reference each and every allegation contained in all paragraphs of this Complaint.

166.    Defendants James W. Turner Construction, Ltd., J.W. Turner Construction, Inc., JWTC Homes, Ltd., James W. Turner Construction, Inc., JWT Interests, Ltd., JWTC-LA, LLC, Castlerock Resources, LLC, James W. Turner and Lauren Turner, individually and/or by and through their agents, servants, officers, and employees, conspired, confederated, and agreed to:

      i.    Knowingly present, or cause to be presented, false or fraudulent claims for

payment or approval by the United States;

ii.   Knowingly make, use, or cause to be made or used, false records or statements material to false or fraudulent claims;

iii.   Knowingly make, use, or cause to be made or used, false records or statements material to an obligation to pay or transmit money to the United States; and

iv.   Knowingly conceal or knowingly and improperly avoid or decrease an obligation to pay or transmit money to the United States,

all in violation of 31 U.S.C. § 3729(a)(1).

167.   Through these actions, Defendants knowingly and repeatedly violated the False Claims Act, 31 U.S.C. §3729(a)(1)(C).

168.   Defendants' actions had the potential to influence the Government's payment decisions and was material to the Government's decisions to pay the claims.

169.   The United States paid the false and fraudulent claims.

170.   Defendants' actions were foreseeable factors in the United States' loss and a consequence of Defendants' schemes.  By virtue of Defendants' actions, the United States has suffered actual damages and is entitled to recover treble damages plus a civil monetary penalty for each false claim.

### VIII.   <u>PRAYER FOR RELIEF</u>

WHEREFORE, Relator respectfully requests on behalf of himself and the United States Government, that the Court enter judgment against the Defendants and award the following:

(1)   Damages in the amount of three (3) times the actual damages suffered by the United States as a result of Defendants' conduct;

(2)   Civil penalties against Defendants up to the maximum allowed by law for each violation of 31 U.S.C. § 3729;

(3) The maximum award Relator may recover pursuant to 31 U.S.C. § 3730(d);

(4) All costs and expenses of this litigation, including attorneys' fees and costs of court; and

(5) All other relief on behalf of Relator or the United States that the Court deems just and proper.

## IX.    DEMAND FOR JURY TRIAL

171.    Pursuant to Federal Rule of Civil Procedure 38, Relator demands a trial by jury.

## X.    EXHIBITS

| EX # | DESCRIPTION | DATE |
|------|-------------|------|
| 1 | Documents transferring employment to Castle Rock | 1/29/2019 |
| 2 | GLO Contract No. 18-179-001-A881 | 10/30/2017 |
| 3 | Notice to Proceed - GLO Contract No. 18-179-001-A881 | 12/19/2017 |
| 4 | GLO Contract No. 19-094-007 | 10/16/2018 |
| 5 | GLO Contract No. 19-094-007-B531 | 12/6/2018 |
| 6 | GLO Contract No. 19-094-007-B532 | 12/9/2018 |
| 7 | GLO Contract No. 19-094-007-B533 | 12/8/2018 |
| 8 | GLO Contract No. 19-094-007-C418 | 4/23/2020 |
| 9 | GLO Contract No. 19-094-007-C568 | 1/8/2021 |
| 10 | GLO Contract No. 19-070-006 | 8/29/2019 |
| 11 | GLO Contract No. 21-088-001-C748 | 1/30/2021 |
| 12 | GLO Contract No. 21-076-001-C743 | 2/8/2021 |
| 13 | GLO Contract No. 12-473-006 | 8/2/2012 |
| 14 | GLO Contract No. 12-473-006-6927 | 8/2/2012 |
| 15 | GLO Contract No. 12-473-006-7416 | 12/12/2012 |
| 16 | GLO Contract No. 12-473-006-7537 | 1/10/2013 |
| 17 | GLO Contract No. 12-473-006-7760 | 9/17/2013 |
| 18 | GLO Contract No. 12-473-006-8205 | 11/15/2013 |
| 19 | GLO Contract No. 12-473-006-8820 | 11/4/2014 |
| 20 | JWTC, Ltd.'s SAM registrations | Mar 2013 – Jan 2020 |
| 21 | Castlerock's SAM registrations | May 2019 – Apr 2021 |
| 22 | RFQ X0013720-AW | 10/11/2017 |
| 23 | RFP X0014978-AW | 5/22/2018 |
| 24 | RFP X0018181-RS | 8/2/2019 |
| 25 | Subcontracting Plan - GLO Contract No. 18-179-001 | 10/16/2017 |
| 26 | 18-179-001 WO A847 Progress Assessment Reports for Jan.-Aug. 2018 | Jan-Aug 2018 |

| 27 | 18-179-001 WO A881 Progress Assessment Report for Jan.-Aug. 2018 | Jan-Aug 2018 |
|----|----|----|
| 28 | 19-094-007 WO B531 Progress Assessment Reports for Jan.-Jul. 2019 and Sep. 2019-Jun. 2020 | Jan-Jul 2019 Sep 2019- Jun 2020 |
| 29 | 19-094-007 WO B532 Progress Assessment Reports for Mar.-Jun. 2020 | Mar-June 2020 |
| 30 | 19-094-007 WO B533 Progress Assessment Reports for  Jan-Jul 2019 and Sep. 2019-Jun. 2020 | Jan-Jul 2019 Sep 2019- Jun 2020 |
| 31 | 19-094-007 WO C418 Progress Assessment Reports for Apr.-Jun. 2020 | Apr-Jun 2020 |
| 32 | Table of payments to subcontractors | |
| 33 | Capomastro, LLC corporate documents | 5/22/2020 |

Respectfully submitted on this the 12th day of October, 2021,

/s/ Charles H. Rabon, Jr.,

RABON LAW FIRM, PLLC
Charles H. Rabon, Jr.
North Carolina State Bar No. 16800
Rabon Law Firm PLLC
413 S. Sharon Amity Road, Suite C
Charlotte, North Carolina 28211
(704) 247-3247
crabon@usfraudattorneys.com

LAW OFFICE OF SARAH M. FRAZIER, PLLC
Sarah M. Frazier
Texas State Bar No. 24027320
1919 Decatur Street
Houston, Texas 77007
(713) 870-5144
sarah@sarahfrazierlaw.com

MOLINA LAW FIRM
Rick Molina
Texas Bar No. 00784621
11550 Fuqua Street, Suite 580
Houston, Texas 77034
(713) 922-4300
rmolina@molinalawfirm.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 15, 2021, a true and correct copy of this RELATOR

CODY WHEELER'S ORIGINAL COMPLAINT AND JURY DEMAND will be sent to the

following individuals via certified mail, return receipt requested:

Merrick B. Garland
United States Attorney General
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Jill O. Venezia
Assistant United States Attorney
United States Attorney's Office for the
Southern District of Texas
United States Department of Justice
1000 Louisiana, Suite 2300
Houston, Texas 77002

*/s/ Charles H. Rabon, Jr.,*

58